EVERITT MESSENGER ET AL. v. THE PENNSYLVANIA RAILROAD COMPANY.

1. Railroad corporations are common carriers and they occupy a peculiar relation to the public as invested with certain franchises for the public benefit, and they are bound to use them with fairness and for the common good.
2. A common carrier owes an equal duty to all and it cannot be discharged if he is allowed to make unequal preferences and thereby prevent or impair the enjoyment of the common right.
3. A contract of a railroad company which gives to certain persons an exclusive advantage or monopoly over all other transporters in the transportation of goods, is unjust and cannot be legally enforced.
4. In the grant of a franchise of building and using a public railway, there is an implied condition that it is held as a *quasi* public trust for the benefit of the public, and the company possessed of the grant must exercise a perfect impartiality to all who seek the benefit of the trust.

On error to the Supreme Court.

For the plaintiffs in error, *Joseph C. Potts.*

For the defendants in error, *I. W. Scudder.*

The opinion of the court was delivered by

BEDLE, J.    The first count of this declaration alleges that in consideration that the plaintiffs were large shippers of live hogs over the lines of the defendants' railways from Pittsburg to Jersey City, the defendants agreed to transport such stock over their railways between those termini, at the regular rates, which were fifty cents per one hundred pounds, subject to a drawback to the plaintiffs of ten cents on the one hundred pounds; also, that if the defendants transported for any other parties than the plaintiffs and seven others named, the same kind of freight from Pittsburg to Jersey City, for less than the regular rates stated, or allowed a drawback from said rates to any others than the plaintiffs and the seven named, that they would allow such further drawback to the plaintiffs as would reduce the cost of shipment to ten cents per hundred pounds less than that of any other person or persons, except the parties mentioned.    The count further alleges the transportation of a large quantity of such stock at the regular rates, less the drawback; also that the defendants carried the same kind of freight for others than the plaintiffs and the favored seven, at the rate of forty cents on the one hundred pounds, and therefore that the plaintiffs are entitled to recover a further rebate of ten cents per hundred.

The second count alleges a like agreement for transportation from Chicago to Jersey City at one dollar per hundred, with a drawback of twenty cents, and a further drawback so as to reduce the cost of transportation to the plaintiffs at twenty cents a hundred pounds less than for any one else, except the seven named.    This count also alleges a transportation for others than those excepted, at eighty cents per hundred, and claims a drawback of twenty cents below that rate.    To these counts a demurrer is interposed.    It will be seen at a glance that a contract of this nature, if valid, gives the plaintiffs an exclusive advantage or monopoly over all other transporters except the seven favorites, and compels the company, under pain of a further reduction below the lowest rates charged all others, to charge them a higher price

than the plaintiffs and those excepted. A few shippers, under this arrangement, would have a practical monopoly of the carrying trade of hogs over the defendant's lines between the termini indicated, at rates which would naturally result in crippling or excluding others from competition and giving to those few a material control of the market at the place of destination. This suit is brought to recover on these counts the additional rebate, an allowance having previously been made according to the first drawback stipulated for.

Can such a contract be legally enforced ? The mere statement of the proposition at once induces an answer that it is unjust and ought not to be sustained, unless some imperative rule of law requires it. The defendants are common carriers, and not only so in the light of the common law, but like all railroad corporations they occupy a peculiar relation to the public as invested with certain franchises for the public benefit, and are bound to use them with fairness and for the common good. Apart from that, however, it is clear that the business of the company must be conducted subject to the law governing common carriers generally, and to that test this contract must first be put. In the language of the books, a common carrier exercises a public employment, and Bacon in his Abridgment, calls it a public institution. 1 *Bacon* (*B*) 556.

The duties and liabilities are those imposed by public law, and in that respect the common carrier differs from the private. Bacon also says that common carriers "are chargeable on the general custom of the realm for their faults and miscarriages." 1 *Bacon* (*A*) 553. Is there anything, then, in the nature of this occupation that necessarily prevents a discrimination in rates such as this contract provides? The contract is that one customer shall be charged less than others, and, as a consequence, that others shall be charged more than that one. Such inequality operates directly upon the course of trade and creates monopolies. Most of the evils of special and unequal rates have arisen since the introduction of railways. In England the subject has been expressly controlled by provisions

in railway charters, or by general acts affecting them all. For that reason it has not been necessary to determine the precise condition of the common law in respect to railway carriers. The English railway cases, therefore, give us no satisfactory light upon the point in question, and in none of the cases under the ancient modes of land carriage is there a direct adjudication. The solution of the question must, then, depend upon the nature of the employment and such deductions as follow from the established principles affecting it.

The business of the common carrier is for the public, and it is his duty to serve the public indifferently. He is entitled to a reasonable compensation, but on payment of that he is bound to carry for whoever will employ him, to the extent of his ability. A private carrier can make what contract he pleases. The public have no interest in that, but a service for the public necessarily implies equal treatment in its performance, when the right to the service is common. Because the institution, so to speak, is public, every member of the community stands on an equality as to the right to its benefit, and, therefore, the carrier cannot discriminate between individuals for whom he will render the service. In the very nature, then, of his duty and of the public right, his conduct should be equal and just to all. So, also, there is involved in the *reasonableness* of his compensation the same principle. A want of uniformity in price for the same kind of service under like circumstances is most unreasonable and unjust, when the right to demand it is common. It would be strange if, when the object of the employment is the public benefit, and the law allows no discrimination as to individual customers, but requires all to be accommodated alike as individuals, and for a reasonable rate, that by the indirect means of unequal prices some could lawfully get the advantage of the accommodation and others not. A direct refusal to carry for a reasonable rate would involve the carrier in damages, and a refusal, in effect, could be accomplished by unfair and unequal charges, or if not to that extent, the public right to the convenience and usefulness of the means of carriage could

be greatly impaired. Besides, the injury is not only to the individual affected, but it reaches out, disturbing trade most seriously. Competition in trade is encouraged by the law, and to allow any one to use means, established and intended for the public good, to promote unfair advantages amongst the people and foster monopolies, is against public policy, and should not be permitted.

A common carrier owes an equal duty to all and it cannot be discharged if he is allowed to make unequal preferences, and thereby prevent or impair the enjoyment of the common right, and, as said by Sharswood, J., in *Audenried* v. *Phil. & Reading R. R. Co.*, 68 *Penn. State R.* 370, "transportation by a common carrier is necessarily open to the public upon equal and reasonable terms. An exclusive right granted to one is inconsistent with the right of all others."

Chief Justice Appleton, in the case of *The New England Express Co.* v. *Maine Central R. R. Co.*, 57 *Maine* 196, also says : " The very definition of a common carrier excludes the idea of the right to grant monopolies, or to give special and unequal preferences." In *Baxendale* v. *The Eastern Counties Railway Co.*, 4 *C. B.* (*N. S.*) 63, two of the judges intimate a notion that unequal rates would not be contrary to the common law, but the same was mere *dictum*, foreign to the question at issue. Previous to that case, *Smith*, in his *Leading Cases*, 4th ed., *Vol.* 1, *p.* 174, had said that " the hire charged must be no more than a reasonable remuneration to the carrier, and, consequently, not more to one (though a rival carrier) than to another for the same service." That clause gave occasion for the intimation of the judges to the contrary in Baxendale v. Eastern Counties Railway Co., and I find, in examining the last edition of *Leading Cases*, 6th ed., *Vol.* 1, *p.* 364, that the editors have substituted for the latter part of his sentence the words, " though at common law there is no liability to carry at equal rates for all customers." The change, no doubt, was made under the force of the Baxendale case, but, in my judgment, Mr. Smith was right in his statement. The view now contended for has been learnedly con-

sidered and sustained by several cases in this country, and must now be taken as the common law doctrine of this state. The following are the cases referred to : *The New England Express Co.* v. *Maine Central R. R. Co.*, 57 *Maine* 188 ; *McDuffee* v. *Railroad*, 52 *N. H.* 430 ; *Sanford* v. *Railroad Co.*, 24 *Penn. State R.* 378 ; 1 *Am. Railway R.* 530; *Audenried* v. *Phil. & Reading R. R. Co.*, 68 *Penn. State R.* 370.

It must not be inferred that a common carrier, in adjusting his price, cannot regard the peculiar circumstances of the particular transportation.   Many considerations may properly enter into the agreement for carriage or the establishment of rates, such as the quantity carried, its nature, risks, the expense of carriage at different periods of time, and the like ; but he has no right to give an exclusive advantage or preference, in that respect, to some over others, for carriage, in the course of his business.   For a like service, the public are entitled to a like price.   There may be isolated exceptions to this rule, where the interest of the immediate parties is alone involved, and not the rest of the public, but the rule must be applied whenever the service of the carrier is sought or agreed for in the range of business or trade.   This contract being clearly within it, and odious to the law in the respect on which a recovery is sought, cannot be sustained.   But there is an additional ground upon which it is also objectionable. I entirely agree with the Chief Justice that, in the grant of a franchise of building and using a public railway, that there is an implied condition that it is held as a *quasi* public trust, for the benefit of all the public, and that the company possessed of the grant must exercise a perfect impartiality to all who seek the benefit of the trust.   It is true that these railroad corporations are private, and, in the nature of their business, are subject to, and bound by the doctrine of common carriers, yet, beyond that, and in a peculiar sense, they are entrusted with certain functions of the government, in order to afford the public necessary means of transportation.   The bestowment of these franchises is justified only on the ground of the public good, and they must be held and enjoyed for

Messenger et al. v. Pennsylvania R. R. Co.

that end. This public good is common, and unequal and unjust favors are entirely inconsistent with the common right. So far as their duty to serve the public is concerned, they are not only common carriers, but public agents, and in their very constitution and relation to the public, there is necessarily implied a duty on their part, and a right in the public, to have fair treatment and immunity from unjust discrimination. The right of the public is equal in every citizen, and the trust must be performed so as to secure and protect it.

Every trust should be administered so as to afford to the *cestui que trust* the enjoyment of the use intended, and these railroad trustees must be held in their relation to the public, to such a course of dealing as will insure to every member of the community the equal enjoyment of the means of transportation provided, subject, of course, to their reasonable ability to perform the trust. In no other way can trade and commercial interchange be left free from unjust interference. On this latter ground, that part of the contract in question is illegal.

There are three other counts also demurred to. It is unnecessary to refer to them in detail. The same vice exists in them as in the other two. The clear intention of the contracts set out in each is, to secure to the plaintiffs a monopoly of the transportation of hogs over the defendants' lines between the termini indicated, at less than any others are to be charged, except the seven named.

The judgment of the Supreme Court must be affirmed.

*For affirmance*—The CHANCELLOR, BEDLE, DALRIMPLE, SCUDDER, WOODHULL, CLEMENT, GREEN, LILLY, WALES. 9.

*For reversal*—None.